No. 24-11192

---

# In the United States Court of Appeals for the Eleventh Circuit

---

EBONI WILLIAMS, *et al.*,

*Plaintiffs-Appellees*,

v.

GERALD SHAPIRO, *et al.*,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:23-cv-03236-VMC (Hon. Victoria Marie Calvert)

---

## BRIEF OF AMERICAN ASSOCIATION FOR JUSTICE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

---

LORI ANDRUS
*President*
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street, NW #200
Washington, DC 20001
(415) 986-1400
lori.andrus@justice.org

JEFFREY R. WHITE
*Counsel of Record*
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street, NW #200
Washington, DC 20001
(202) 617-5620
jeffrey.white@justice.org

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* the American Association for Justice certifies that it is a non-profit organization. It has no parent corporation or publicly owned corporation that owns ten percent or more of its stock.

Respectfully submitted this 4th day of October 2024.

/s/ Jeffrey R. White

JEFFREY R. WHITE
*Counsel for Amicus Curiae*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rules 26.1-1, 26.1-2, 28-1(b), and 29-2, undersigned counsel for *amicus curiae* gives notice of the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

A360 Holdings LLC (Appellant)

A360 Profit Sharing Plan (Appellee)

American Association for Justice (Amicus Curiae)

Argent Financial Group, Inc. (100% owner of Argent Trust Company)

Argent Trust Company (Appellant)

Bailey III, Harry B. (Counsel for Appellees)

Berman Fink Van Horn P.C. (Counsel for Appellants)

Brinkley, Scott (Appellant)

Calvert, Honorable Victoria M. (United States District Court Judge)

Dearing, Lea C. (Counsel for Appellants)

Dunn Harrington LLC (Counsel for Appellees)

Edelman, Marc R. (Counsel for Appellees)

Engstrom, Carl (Counsel for Appellees)

Engstrom Lee (Counsel for Appellees)

Fink, Benjamin (Counsel for Appellants)

Foley & Lardner (Counsel for Appellants)

Harrington III, Robert Earl (Counsel for Appellees)

Herring, Shadrin (Appellee)

Hill, Brandon J. (Counsel for Appellees)

Holland & Knight LLP (Counsel for Appellant Argent Trust Company)

House, Bryan B. (Counsel for Appellants)

JonesGranger (Counsel for Appellees)

Kovelesky, Tina, (Appellee)

Lee, Jennifer Kim (Counsel for Appellees)

McCarthy, Chelsea Ashbrook (Counsel for Appellant Argent Trust Company)

Origin Bancorp, Inc. (Publicly traded company that owns more than 10% of common stock of Argent Financial Group Inc.)

Ridley, Eileen R.  (Counsel for Appellants)

Morgan & Morga (Counsel for Appellees)

Shapiro, Gerald (Appellant)

Shoemaker, Paula Mays (Appellee)

Thomson, Mark E. (Counsel for Appellees)

Wenzel Fenton Cabassa, P.A. (Counsel for Appellees)

Williams, Eboni (Appellee)

White, Jeffrey R. (Counsel for Amicus Curiae)

Wozniak, Todd D. (Counsel for Appellant Argent Trust Company)

To the best of the undersigned counsel's knowledge, no other persons, association of persons, firms, partnerships, or corporations have an interest in the outcome of this case or appeal.

Respectfully submitted this 4th day of October 2024.

/s/ Jeffrey R. White

JEFFREY R. WHITE
*Counsel for Amicus Curiae*

iv

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT**......................................................i

**CERTIFICATE OF INTERESTED PERSONS**...................................................ii

**TABLE OF CONTENTS** ..................................................................................v

**TABLE OF CITATIONS** .................................................................................vi

**IDENTITY AND INTEREST OF *AMICUS CURIAE*** ..................................1

**ARGUMENT** .....................................................................................................5

**I.    THE FAA PRESERVES PLAINTIFFS' RIGHT TO EFFECTIVELY VINDICATE THEIR FEDERAL STATUTORY RIGHTS, INCLUDING THE RIGHT TO RECOVER PLAN LOSSES DUE TO BREACH OF FIDUCIARY DUTY**...............................................................................5

    A.  The Waiver Provisions Inserted into the ERISA Plan Deprive Participants and Beneficiaries of the Statutory Rights Congress Enacted for Their Protection. ...................................................................................................5

    B.  The Right to Bring a Representative Action on Behalf of the Plan Is Not Procedural or Waivable. .....................................................................................8

    C.  ERISA Does Not Bar a Plan Participant from Bringing a Representative Suit on Behalf of the Plan to Redress the Plan's Losses. ..........................12

**II.   THE COMMON LAW OF CONTRACTS HAS LONG RECOGNIZED THAT CONTRACTUAL WAIVERS OF STATUTORY PROTEC-TIONS ENACTED FOR THE PUBLIC GOOD ARE VOID AND UNENFORCEABLE**...............................................................................14

**III.  CONTRACTUAL WAIVERS OF THE RIGHT TO BRING A STATUTORY CAUSE OF ACTION HAVE HISTORICALLY BEEN HELD TO BE VOID AND UNENFORCEABLE, PARTICULARLY IN EMPLOYMENT CONTRACTS.** ...............................................................19

**CONCLUSION**..................................................................................................26

# TABLE OF CITATIONS

## Cases

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ................................................................. 8, 9, 10

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
501 U.S. 104 (1991) ................................................................. 16

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ................................................................. 10

*Carter's Adm'rs v. Carter*,
20 Fla. 558 (1884) ................................................................... 18

*City of Cambridge Ret. Sys. v. Ersek*,
921 F.3d 912 (10th Cir. 2019) ................................................. 8

*Crowe v. Liquid Carbonic Co.*,
102 N.E. 573 (1913) ................................................................. 19

*Duncan v. Thompson*,
315 U.S. 1 (1942) .................................................................... 23

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ................................................... 10, 11, 15

*Fox Midwest Theatres v. Means*,
221 F.2d 173 (8th Cir. 1955) ................................................... 16

*Gaines v. Carrollton Tobacco Bd. of Trade, Inc.*,
386 F.2d 757 (6th Cir. 1967) ................................................... 16

*Grannis v. Super. Ct. of S.F.*,
146 Cal. 245 (1905) ................................................................. 17

*Haman v. Allied Concrete Prod., Inc.*,
495 P.2d 531 (Alaska 1972) .................................................... 21

*Hancock v. Norfolk & W. Ry. Co.*,
    32 S.E. 679 (N.C. 1899).........................................................................25

*Hudson v. P.I.P. Inc.*,
    793 F. App'x 935 (11th Cir. 2019) ........................................................8

*Kamanu v. E.E. Black, Ltd.*,
    41 Haw. 442 (1956) ..............................................................................22

*Lake Shore & M.S.R. Co. v. Spangler*,
    8 N.E. 467 (Ohio 1886).........................................................................24

*LaRue v. DeWolff, Boberg & Assocs., Inc.*,
    552 U.S. 248 (2008)............................................................... 3, 12, 13, 14

*Lochner v. New York*,
    198 U.S. 45 (1905).................................................................................24

*Lozano v. Montoya Alvarez*,
    572 U.S. 1 (2014)..................................................................................16

*Mass. Mut. Life. Ins. Co. v. Russell*,
    473 U.S. 134 (1985).........................................................................7, 13

*Mills v. Bennett*,
    30 S.W. 748 (Tenn. 1895)................................................................ 18, 19

*Missouri Pac. Ry. Co. v. Mackey*,
    127 U.S. 205 (1888)..............................................................................23

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)....................................................................... passim

*Moxley v. Ragan*,
    73 Ky. 156 (1874).................................................................................19

*Mumford v. Chicago, R.I. & P.R. Co.*,
    104 N.W. 1135 (Iowa 1905) .................................................................24

*Offshore Logistics, Inc. v. Tallentire*,
    477 U.S. 207 (1986)................................................................................8

*Pilot Life Ins. Co. v. Dedeaux*,
   481 U.S. 41 (1987)..................................................................26

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
   388 U.S. 395 (1967)................................................................15

*Recht v. Kelly*,
   82 Ill. 147 (1876) ..................................................................18

*Redel's Inc. v. Gen. Elec. Co.*,
   498 F.2d 95 (5th Cir. 1974) ....................................................15

*United States v. Bryant*,
   996 F.3d 1243 (11th Cir. 2021) ..............................................16

*United States v. Phillips*,
   19 F.3d 1565 (11th Cir. 1994) ................................................16

*Viking River Cruises, Inc. v. Moriana*,
   596 U.S. 639 (2022)...................................................... 8, 11, 12

*Wilko v. Swan*,
   346 U.S. 427 (1953)..................................................................7

*Williams v. Shapiro*,
   No. 1:23-cv-03236-VMC, 2024 WL 1208297 (N.D. Ga. Mar. 20, 2024) .........6, 9

**Statutes**

9 U.S.C. § 2............................................................... 4, 15, 19, 26

45 U.S.C. § 51 *et seq.*............................................................25

ERISA § 409 ..........................................................................6, 14

ERISA § 502 .................................................................... passim

Cal. Civ. Code § 1970 (West)....................................................25

Cal. Civ. Code § 3513 (West)....................................................17

Fed. R. Civ. P. 23 .....................................................................9

## Other Authorities

Liability of Employers, H. Rep. No. 1386, 60th Cong., 1st Sess. (1908) ..............22

Michael S. Gordon, *Overview: Why Was ERISA Enacted?*,
  *in* Special Comm. on Aging, U.S. Senate, 98th Cong., 2d Sess.,
  *The Employee Retirement Income Security Act of 1974: The First Decade*
  (Comm. Print 1984) ...............................................................................................26

15 *Williston on Contracts* § 1750A (3d ed. 1972)....................................................16

W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 80
  (5th ed. 1984)..........................................................................................................21

Arthur Larson, *Law of Workmen's Compensation* § 4.50 (1968) ..........................22

Lawrence M. Friedman, *A History of American Law* (1973)........................... 21, 22

Walter Licht, *Working for the Railroad: The Organization of Work in the
  Nineteenth Century* (1983)......................................................................................20

G. Edward White, *Tort Law in America: An Intellectual History* (1980)...............21

Thomas E. Baker, *Why Congress Should Repeal the Federal Employers'
  Liability Act of 1908*, 29 Harv. J. on Legis. 79 (1992) .........................................21

Myriam Gilles & Gary Friedman, *Unwaivable: Public Enforcement Claims
  and Mandatory Arbitration*, 89 Fordham L. Rev. 451 (2020) ..............................18

Melvin L. Griffith, *The Vindication of a National Public Policy Under the
  Federal Employers' Liability Act*, 18 Law & Contemp. Probs. 163 (1953) . 17, 20

Wex S. Malone, *American Fatal Accident Statutes-Part I:
  The Legislative Birth Pains*, 4 Duke L.J. 673 (1965)...........................................23

Ryan Martins, Shannon Price, & John Fabian Witt, *Contract's Revenge: The
  Waiver Society and the Death of Tort*, 41 Cardozo L. Rev. 1265 (2020) ..... 17, 25

*Master and Servant — Duty of Master to Provide Safe Appliances — Contracts
  Limiting Liability*, 18 Harv. L. Rev. 316 (1905)...................................................23

Gary T. Schwartz, *Tort Law and the Economy in Nineteenth-Century America: A Reinterpretation*, 90 Yale L.J. 1717 (1981) ......................................................20

John Fabian Witt, *Toward a New History of American Accident Law: Classical Tort Law and the Cooperative Firstparty Insurance Movement*, 114 Harv. L. Rev. 690 (2001) ....................................................................... 20, 21

Emp. Benefits Sec. Admin., U.S. Dep't of Labor, *EBSA Restores Over $1.4 Billion to Employee Benefit Plans, Participants, and Beneficiaries* (Oct. 14, 2022), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/ebsa-monetary-results ............................................................26

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The American Association for Justice ("AAJ") is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ members primarily represent plaintiffs in personal injury actions, employment rights cases, consumer cases, and other civil actions, including ERISA actions. Throughout its 78-year history, AAJ has served as a leading advocate for the right of all Americans to seek legal recourse for wrongful conduct.

AAJ addresses this Court with respect to an issue of crucial concern to all Americans for whom Congress has enacted statutory rights along with civil enforcement means to protect those rights—not only in ERISA, but also in many other consumer protection and worker protection laws. Those protections ring hollow if millions of American workers and their families have no forum to effectively vindicate their statutory rights. AAJ urges this Court to reject the notion that companies should be free to use their dominant position to privately contract their way out of the accountability Congress has legislated for the public good.

---

[1] No counsel for any party authored this brief in whole or in part. Apart from the *amicus curiae*, no person, party, or party's counsel contributed money intended to fund the brief's preparation and submission.

## SUMMARY OF ARGUMENT

1.      The validity and enforceability of contract waivers of statutory rights is an issue of great importance far beyond the ERISA plan in this case. Many workers and consumers depend upon the rights Congress has legislated for their protection. Those rights ring hollow if companies and individuals are allowed to privately contract their way out of accountability. AAJ urges this Court to reject the notion that the Federal Arbitration Act (FAA) requires enforcement of such waivers, which have long been viewed as invalid as a matter of general contract law.

The A360 retirement plan in this case expressly prohibits participants from exercising their right under ERISA § 502(a)(2) to bring a representative suit on behalf of the plan to recover losses to the plan due to breach of fiduciary duty. This prospective waiver flatly violates the Supreme Court's rule against arbitration provisions that prevent parties from effectively vindicating their statutory rights. Individual actions for losses limited to individual accounts do not permit participants to effectively vindicate their right to sue for plan-wide relief on behalf of the plan.

Defendants' arguments that the effective vindication doctrine does not apply to the A360 retirement plan are not persuasive. First, Defendants attempt to characterize the right to bring a representative suit as procedural in the same manner that the right to bring class actions or collective actions is procedural, and therefore waivable. The Supreme Court has squarely addressed this fallacious argument. As

the Court has stated, class and collective action procedures allow plaintiffs to aggregate their substantive law claims; eliminating those procedural mechanisms does not alter the claims' substantive merits. Precluding representative actions, by contrast, eliminates the litigant's substantive right entirely. Additionally, class action waivers are enforced under the FAA because the formal protections needed to protect absent claimants undermine the simplicity and informality of arbitration. Representative suits do not present those obstacles, and so the FAA does not require enforcement of waivers of representative suits.

Second, the Supreme Court's decision in *LaRue v. DeWolff, Boberg & Associates., Inc*., 552 U.S. 248 (2008), did not eliminate an ERISA plan participant's right to bring a representative lawsuit on the plan's behalf for plan-wide relief. *LaRue* held that § 502(a)(2) permits suits for the loss of value of plan assets in individual accounts for participants in defined contribution plans. The Court made clear that this remedy is *in addition to*, not instead of, suits seeking plan-wide relief.

In short, the effective vindication doctrine is directly applicable to the A360 Plan in this case, which is consequently invalid and unenforceable.

2.    The effective vindication doctrine is firmly grounded in the long-recognized principle of general contract law that waivers of statutory protections enacted for the public good are void and unenforceable. Congress enacted the FAA as an "equal treatment rule" to make agreements to arbitrate as enforceable as any other contract,

3

but not more so; Section 2 authorizes courts to reject arbitration agreements on grounds that would render "any contract" unenforceable. 9 U.S.C. § 2.

One such common-law defense that long predates the FAA is that private contracts will not be enforced to undermine statutory rights the legislature has enacted for the public good. For example, this general contract defense was applicable in connection with "exemption acts" that protected certain property from attachment or seizure due to debt default. Lenders and sellers responded by requiring borrowers and installment buyers to waive those statutory protections.

Courts in many states held such contractual waivers invalid and unenforceable on public policy grounds. As those common-law judges explained, enforcing such waivers would allow private parties with dominant bargaining power to render legislation enacted for the public good ineffective. The Supreme Court's effective vindication doctrine is rooted in this contract-law tradition.

3.    Contract waivers of the right to bring a statute-created cause of action have long been deemed invalid and unenforceable, particularly in employer-employee contracts. The tremendous rise in on-the-job deaths and injuries that accompanied the Industrial Revolution gave rise to the development of tort law negligence doctrines. Employers—most notably railroads—persuaded the common-law courts to adopt an "unholy trinity" of defenses: the fellow-servant rule, comparative negligence, and assumption of the risk. To counter these defenses, most state

legislatures enacted Employers' Liability statutes establishing a cause of action for wrongful death or injury to workers due to negligence, including that of a fellow employee. In response, many employers inserted into their employment contracts a waiver of the statutory right to bring an Employers' Liability lawsuit.

Courts around the country invariably held those waivers—including waivers of statutory rights to bring representative lawsuits, such as actions for wrongful death caused by a fellow employee—void and unenforceable as against public policy. The courts' reasoning that public policy must not be outdone by private agreements is as compelling today as it was prior to the FAA's enactment.

ERISA now protects 153 million workers, retirees, and dependents whose financial future depends upon the effectiveness of the civil enforcement scheme Congress put in place. This Court should not allow companies and individuals who control retirement plans to write their own immunity into plan documents.

## ARGUMENT

## I. THE FAA PRESERVES PLAINTIFFS' RIGHT TO EFFECTIVELY VINDICATE THEIR FEDERAL STATUTORY RIGHTS, INCLUDING THE RIGHT TO RECOVER PLAN LOSSES DUE TO BREACH OF FIDUCIARY DUTY.

### A. The Waiver Provisions Inserted into the ERISA Plan Deprive Participants and Beneficiaries of the Statutory Rights Congress Enacted for Their Protection.

Plaintiffs in this case, participants in the A360, Inc. Employee Stock Ownership Plan ("Plan"), allege that the Plan's fiduciaries arranged the sale of the

5

Plan's A360 stock below its fair market value, resulting in profits for themselves and losses to the Plan and its beneficiaries. *Williams v. Shapiro*, No. 1:23-cv-03236-VMC, 2024 WL 1208297, at *13 (N.D. Ga. Mar. 20, 2024) [hereinafter "Dist. Ct. Op."]. They brought suit under ERISA §§ 502(a)(2) and 409(a), seeking, inter alia, to recover those losses on behalf of the Plan. Defendants moved to compel arbitration based on the Third Amendment to the plan document (adopted on the day the Plan was terminated), which requires that claims not only be arbitrated, but also "brought solely in the Claimant's individual capacity and not in a representative capacity or on a class, collective, or group basis." *Id.* at *8.

The district court denied Defendants' motion, holding the arbitration and waiver provision "invalid under the effective vindication doctrine." *Id.* at *35. Because the provision by its terms was not severable, the court denied enforcement of the arbitration agreement in its entirety. *Id.* at *36. The application of that doctrine is central to Defendants' appeal to this Court.

The Employee Retirement Income Security Act (ERISA) of 1974, Pub. L. 93-406, Title I, § 502, 88 Stat. 891 (codified as amended at 29 U.S.C. § 1132) provides retirement plan participants broad remedies for breach of fiduciary duty. Under ERISA § 502(a)(2), a participant may sue "for appropriate relief under § 409," *id.*, which, in turn, makes fiduciaries "personally liable to make good to [the] plan *any* losses to the plan." ERISA § 409, 88 Stat. at 886 (codified as amended at 29 U.S.C.

6

§ 1109). Importantly, "actions for breach of fiduciary duty" are "brought in a representative capacity on behalf of the plan as a whole." *See Mass. Mut. Life. Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985).

The Plan, however, expressly bars plaintiffs from bringing such a representative suit action for reimbursement to the plan of plan-wide losses. The district court correctly held that this attempt to waive Plaintiffs' statutory rights violated the "effective vindication" doctrine.

For much of the twentieth century, the prevailing view held that agreements to arbitrate federal statutory claims were not enforceable under the FAA. *See, e.g.*, *Wilko v. Swan*, 346 U.S. 427 (1953). In 1985, the Court changed its view, explaining that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute," but merely "submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985). The Court cautioned that the FAA permits enforcement of arbitration agreements only "so long as the prospective litigant *effectively may vindicate its statutory cause of action* in the arbitral forum." *Id.* at 637 (emphasis added). In that way, "the statute will continue to serve both its remedial and deterrent function." *Id.* If the arbitration agreement "operated . . . as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against

7

public policy." *Id.* at 637 n.19.

This Court can affirm on that basis alone. The Supreme Court has made clear that its effective vindication doctrine "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013). *See also Hudson v. P.I.P. Inc.*, 793 F. App'x 935, 938 (11th Cir. 2019). That is precisely what the Third Amendment to the Plan does in this case.

### B. The Right to Bring a Representative Action on Behalf of the Plan Is Not Procedural or Waivable.

Defendants contend that the effective vindication doctrine does not apply to their waiver provision because Plaintiffs' § 502(a)(2) right to bring a representative lawsuit is not substantive, but merely procedural. Brief of Defendants-Appellants ("Defs.' Br.") 5, 21. This is plainly wrong.

Representative causes of action are defined by substantive law. *E.g.*, *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 227 (1986) (holding that state substantive law applied to wrongful death on the high seas action); *City of Cambridge Ret. Sys. v. Ersek*, 921 F.3d 912, 918 (10th Cir. 2019) (holding that the sufficiency of shareholders' derivative action complaint "depends upon the substantive law of the state"). *See also Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 657 (2022) (referring to representative suits as "part of the basic architecture of much of substantive law"). The representative suit authorized by Congress in ERISA is

8

likewise substantive and serves both a "remedial and deterrent function." *Mitsubishi*, 473 U.S. at 637.

Defendants argue instead that representative actions belong in the same basket as class actions or collective actions. Defendants insist that Plaintiffs are "seeking to have a class action certified, but that is a procedural right that can be waived." Defs.' Br. 27 (citing *Italian Colors*, 570 U.S. at 234–35); *see also id.* at 24 (referring to the Plan provision as a "class waiver" or waiver of "collective action"); *id.* at 42 ("Defendants urge this Court to find that Plaintiffs do not have a nonwaivable, statutory right to seek monetary relief on behalf of absent Plan participants or their Plan accounts.").

At the outset, it should be clear that Plaintiffs' class action claims are permissible, but not because the *class action* waiver is invalid; They are permissible because the ban on *representative* suits is invalid and by its terms nonseverable, rendering the entire arbitration procedure "null and void." Dist. Ct. Op. at *9–10. Defendants are unhappy with a litigation problem of their own making.

More to the point, the right to bring a representative action simply does not belong in the same basket as a right to pursue claims on a class action or collective action basis. The Court in *American Express Co. v. Italian Colors Restaurant* made clear that the right to class certification by meeting the requirements of Federal Rule Civil Procedure 23 is procedural because the rule does not vest claimants with any

substantive right. 570 U.S. at 236. Class actions are simply procedural mechanisms for aggregating a multitude of persons with similar substantive claims in a single civil action, and an individual could obtain the same relief even if the class action procedure were unavailable. *Id.* at 236–37. The waiver in this case, by contrast, prohibits representative actions as well as individual suits seeking plan-wide relief, making that substantive remedy unavailable entirely.

Additionally, as the Court made clear, representative suits are not like class actions or collective actions because they do not interfere with the FAA's informality. Class action waivers are enforceable because arbitration on a class or collective basis would transform the "individualized and informal . . . arbitration process" into the "litigation it was meant to displace." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 508–09 (2018). *See also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011) (stating that parties may agree to arbitrate using class action procedures, but that "is not arbitration as envisioned by the FAA").

The Court explained that the aggregation of a multitude of individual claims, with the procedural formalities necessary to protect the rights of the numerous absent plaintiffs who will be bound by the outcome, "interfere[s] with a fundamental attribute of arbitration." *Epic Sys.*, 584 U.S. at 508. In the Court's view, requiring an arbitration to comply with class action procedures would threaten to mire the process in a "procedural morass." *Concepcion*, 563 U.S. at 348; *Italian Colors*, 570 U.S. at

238. Because they are multi-party, collective proceedings share those same risks. *Epic Sys.*, 584 U.S. at 508.

By contrast, representative actions pose none of these problems. The Court addressed precisely this issue in *Viking River Cruises, Inc. v. Moriana*. There, the plaintiff sued her former employer under the Private Attorney General Act (PAGA), alleging that her final wages violated provisions of the California Labor Code. 596 U.S. at 653. The employer moved to compel arbitration under her employment agreement, which provided that the parties "could not bring any dispute as a class, collective, or representative action under PAGA." *Id.* at 639.

Justice Alito, writing for the majority, noted that California courts viewed PAGA actions as a "type of *qui tam* action," *id.* at 644, that is, a "representative action" in which the employee-plaintiff sues as an "agent or proxy" of the State. Unlike the class-action plaintiff, who "represents a multitude of absent individuals," the PAGA plaintiff "represents a single principal." *Id.* at 655. As a result of this structural difference, representative "PAGA suits exhibit virtually none of the procedural characteristics of class actions," designed to protect absent class members. *Id.* Instead, it is the type of one-on-one representative action that is "part of the basic architecture of much of substantive law," like shareholder-derivative

11

suits and wrongful-death actions. *Id.* at 657.[2] The Court concluded that the FAA does not "mandate the enforcement of waivers of representative capacity." *Id.*[3]

Plaintiff's ERISA action in this case is likewise a representative action by a single claimant on behalf of a single party, the Plan. The FAA does not require a court to enforce a purported waiver of Plaintiff's right to bring that suit.

### C. ERISA Does Not Bar a Plan Participant from Bringing a Representative Suit on Behalf of the Plan to Redress the Plan's Losses.

Defendants also contend that the effective vindication doctrine is inapplicable because, following the Court's decision in *LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248 (2008), an ERISA participant no longer has a right to bring a representative suit on behalf of the plan as a whole. Rather, "a participant suing to remedy the harm caused by a fiduciary breach can pursue the ERISA § 502(a)(2) claim on behalf of her individual plan account *only*." Defs.' Br. 27 (emphasis added).

It is plainly not so. The right to bring a representative action seeking plan-

---

[2] The Court also noted, relevant to this case, that "although the statute gives other affected employees a future interest in the penalties awarded in an action, that interest does not make those employees 'parties' in any of the senses in which absent class members are." *Id.*

[3] Plaintiff also sought penalties under PAGA based on violations of the Labor Code involving other employees. The Court stated that such joinder of multiple claims *was* similar to class action procedure, and the FAA required enforcement of waivers of such PAGA actions. Because California law did not permit separating the representative from non-individual claims, the state's broad ban on waivers of PAGA actions could not stand. *Id.* at 662–63.

wide relief remains a substantive right under ERISA §§ 502(a)(2) and 409(a). The *LaRue* Court held that a plaintiff seeking to recover losses to their own account due to a breach of fiduciary duty is cognizable under § 502(a)(2), separate from and *in addition to* the remedy of plan-wide relief previously recognized by the Court in *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134 (1985).

In *Russell*, the plaintiff was a participant in a defined benefit plan. *Id.* at 148. She alleged that the fiduciary improperly processed her claim for disability benefits, causing a significant delay in her receipt of the promised benefit amount, and consequential damages. *Id.* at 137–38. Justice Stevens, writing for the Court, held that § 502(a)(2) provides "remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." *Id.* at 142. Recovery of Russell's consequential damages would not "inure to the benefit of the plan as a whole." *Id.* at 140.

By the time the Court decided *LaRue*, the "landscape ha[d] changed." 552 U.S. at 254. Mr. LaRue was a participant in a defined contribution plan. He had an individual account, and his benefit was determined by the value of the stocks in that account. *Id.* at 250–51. He alleged the fiduciary's failure to carry out his investment directions caused his account to lose value. The Court, again through Justice Stevens, held that § 502(a)(2) "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *Id.* at 256.

Nowhere did the Court suggest that a plan participant could no longer sue to recover losses to the "entire plan." *Id.* at 254. Rather, the *LaRue* Court *expanded* its view of the remedies available under § 502(a)(2) to include losses to a small portion of the plan assets in a single account, as well as losses to the plan as a whole. *Id.* at 253. The Court made clear that either remedy could be pursued in a representative lawsuit. *Id.* at 256 (Whether a fiduciary breach diminishes plan assets payable to all participants and beneficiaries, or only to persons tied to particular individual accounts, it creates the kind of harms that concerned the draftsmen of § 409.").

Plainly, the contractual waiver at issue is invalid and unenforceable because it prevents participants and beneficiaries from effectively vindicating their explicit ERISA right to bring a representative lawsuit to recover losses to the entire A360 Plan.

## II.    THE COMMON LAW OF CONTRACTS HAS LONG RECOGNIZED THAT CONTRACTUAL WAIVERS OF STATUTORY PROTECTIONS ENACTED FOR THE PUBLIC GOOD ARE VOID AND UNENFORCEABLE.

Defendants largely discount or ignore entirely the plain meaning of the Supreme Court's pronouncement that if an arbitration provision operated "as a prospective waiver of a party's right to pursue statutory remedies," it would be invalid and unenforceable under the FAA. *Mitsubishi*, 473 U.S. at 637 n.19. Defendants instead vigorously insist that "liberal federal policy favor[s] arbitration agreements," Defs.' Br. 15, 29–30, and the arbitration agreement—including the

14

waiver of the right to bring representative suits—must be "enforced as written." *Id.* at 15, 19, 21.

These general statements cannot bear the weight Defendants would have them support in this case. Congress did not mandate arbitration at all costs. Congress enacted the FAA to make agreements to arbitrate disputes "as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967). *See also Epic Sys.*, 584 U.S. at 507 ("[Section 2 of the FAA] establishes a sort of 'equal-treatment' rule for arbitration contracts"); *Kindred Nursing Ctrs. L. P.* v. *Clark*, 581 U.S. 246, 251 (2017) (same). The FAA enforces agreements "to settle by arbitration"; it must not be gamed to shut the doors of both the courthouse and the arbitral forum to legitimate claimants. Defendants seek precisely that outcome in this case. 9 U.S.C. § 2.

The district court correctly ruled that Defendants' contractual waiver of the right to bring a representative lawsuit is invalid and unenforceable under the Supreme Court's "effective vindication" doctrine. Dist. Ct. Op. at *35.

The Supreme Court did not invent this doctrine out of whole cloth. As the authorities relied upon by the Court suggest, the doctrine is firmly rooted in the long-settled principle of contract law that, as a matter of "public policy," courts will not enforce contracts that waive statutory legal rights. *See Mitsubishi*, 473 U.S. at 637 n.19 (citing *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974) (holding

that inserting a liability waiver in franchise agreement "to bar private antitrust actions arising from subsequent violations is clearly against public policy"); *Gaines v. Carrollton Tobacco Bd. of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir. 1967) (holding that an agreement "to waive [treble damages for] future violations of the antitrust laws, would be invalid on public policy grounds"); and *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955) (holding that a contract provision "to absolve one party from liability for future violations of the anti-trust statutes against another would to that extent be void as against public policy")).

Finally, the *Mitsubishi* Court's footnote cites to 15 *Williston on Contracts* § 1750A (3d ed. 1972). Professor Williston there summarized the common-law principle that a contract provision that has the effect of conferring complete immunity on one party will be held void if the agreement is (1) violative of a statute, (2) contrary to a substantial public interest, or (3) gained through inequality of bargaining power. *Id.* This anti-waiver principle of the common law of contracts has a long history. Congress 'legislate[s] against a background of common-law adjudicatory principles.'" *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014) (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991)), and "Congress is presumed to be knowledgeable about existing case law pertinent to any legislation it enacts." *United States v. Bryant*, 996 F.3d 1243, 1259 (11th Cir. 2021) (quoting *United States v. Phillips*, 19 F.3d 1565, 1581 (11th Cir. 1994)). In

16

this instance, contract law prior to the FAA recognized as a general principle that contract waivers of rights conferred by statute are void and unenforceable.

The mid-nineteenth century to early- twentieth century could be called the "freedom of contract era." The dominant view postulated that all risk, whether of economic loss, personal injury, or even death, could be managed by the marketplace and reflected in the contractually agreed price of goods or labor. Ryan Martins, Shannon Price, & John Fabian Witt, *Contract's Revenge: The Waiver Society and the Death of Tort*, 41 Cardozo L. Rev. 1265, 1269–75 (2020). *See also* Melvin L. Griffith, *The Vindication of a National Public Policy Under the Federal Employers' Liability Act*, 18 Law & Contemp. Probs. 163 (1953) (stating that the "period intervening between the beginning in America of the railway epoch and the final enactment of the Federal Employers' Liability Act in 1908, saw the rise and fall of *laissez faire*"). Nevertheless, contract law did not give free license for abusive practices seeking private profit at the expense of public good.

For example, the California legislature commanded in 1872 that "a law established for a public reason cannot be contravened by a private agreement." Cal. Civ. Code § 3513 (West). Under this anti-waiver rule, the California Supreme Court explained, "there can be no effectual waiver by the parties of any restriction established by law for the benefit of the public." *Grannis v. Super. Ct. of S.F.*, 146 Cal. 245, 253 (1905). *See* Myriam Gilles & Gary Friedman, *Unwaivable: Public*

*Enforcement Claims and Mandatory Arbitration*, 89 Fordham L. Rev. 451 (2020) (tracing the nineteenth-century origins of California's anti-waiver laws).

Legislatures around the country enacted legislation during this period to protect vulnerable individuals from the consequences of unfair contracts or simple misfortune, and courts around the country invalidated contract provisions purporting to waive the protections of those enactments. One example involved "exemption acts," statutes that exempted certain property (such as household goods) from seizure or attachment for non-payment of debts. Lenders and vendors responded by inserting into loan agreements and installment sales agreements provisions in which the borrower/buyer purportedly waived these statutory protections. Courts in many states held such contractual waivers void as against public policy. *E.g.*, *Recht v. Kelly*, 82 Ill. 147, 148 (1876) (citing cases). As the Supreme Court of Florida declared:

> In view of the recognized policy of the States in enacting exemption laws and of the practically universal concurrence of the authorities on the identical question, our conclusion is that the "waiver" of the benefit and protection of the exemption laws contained in this note is not valid to defeat a claim of exemption.

*Carter's Adm'rs v. Carter*, 20 Fla. 558, 570–71 (1884).

Similarly, the Supreme Court of Tennessee, surveying the decisions from other jurisdictions, concluded that "the main current of judicial enunciation is against the validity of such contracts." *Mills v. Bennett*, 30 S.W. 748, 749 (Tenn. 1895). Such a private contract "contravenes a sound public policy, and, if enforced,

abrogates the exemption statutes." *Id.* The New York Court of Appeals agreed, holding waivers of the statutory exemptions invalid as "inconsistent with the public policy which the legislative act manifested." *Crowe v. Liquid Carbonic Co.*, 102 N.E. 573, 575 (1913). Courts reasoned, pragmatically, that judicial enforcement of such provisions would invite creditors to insert them into every contract, with the result that "the exemption law of the state would be virtually obsolete." *Moxley v. Ragan*, 73 Ky. 156, 158 (1874).

The Supreme Court's "effective vindication" doctrine is firmly rooted in the broader common-law rule that waivers of statutory protections enacted in the public interest are void. That general principle, which stands as a defense to the enforcement of "any contract," renders the A360 Plan waiver of Plaintiffs' right to bring a representative action seeking plan-wide relief unenforceable. 9 U.S.C. § 2.

## III. CONTRACTUAL WAIVERS OF THE RIGHT TO BRING A STATUTORY CAUSE OF ACTION HAVE HISTORICALLY BEEN HELD TO BE VOID AND UNENFORCEABLE, PARTICULARLY IN EMPLOYMENT CONTRACTS.

An even closer analog to the present case involves the general principle that courts will refuse to enforce provisions—particularly in employment contracts—that purport to show one party has waived the right to assert a statutory cause of action that the legislature has put in place to protect such parties. Such overreaching "agreements" have long been widely condemned as void and unenforceable—in contracts having nothing to do with arbitration and long before the FAA—as a matter

of public policy.

From 1870 to 1910, industrialization transformed the United States into "the world's premier economic power," bringing progress and higher living standards to Americans nationwide. Gary T. Schwartz, *Tort Law and the Economy in Nineteenth-Century America: A Reinterpretation*, 90 Yale L.J. 1717, 1748 (1981). But the "dark and bitter" underside to this story is told in the sudden increase of workers who were killed and injured by huge machines lacking basic safety protections. *See generally* Griffith, *supra*, at 163. "In the second half of the nineteenth century, the United States experienced an accident crisis like none the world had ever seen and like none any Western nation has witnessed since." John Fabian Witt, *Toward a New History of American Accident Law: Classical Tort Law and the Cooperative Firstparty Insurance Movement*, 114 Harv. L. Rev. 690, 694 (2001).

Much of the struggle for accountability for on-the-job accidents–and, therefore, greater workplace safety—involved railroad workers. During this period, railroads dominated all facets of the American economy, and the perils faced by railroad workers were excessive, even by the norms of the time. The rates of death and serious injury to railroad workers were "astronomical," accounting for an estimated sixty-four percent of all occupational fatalities. Walter Licht, *Working for the Railroad: The Organization of Work in the Nineteenth Century* 124–29 (1983). In 1890, one railroad worker in every three hundred was killed on the job. Among

20

freight railroad brakemen, one in every hundred died in work accidents *each year*. Witt, *supra*, at 694–95. *See also* Thomas E. Baker, *Why Congress Should Repeal the Federal Employers' Liability Act of 1908*, 29 Harv. J. on Legis. 79, 81 (1992) ("The injury rate among railroad employees in the late nineteenth century was horrific— the average life expectancy of a switchman was seven years, and a brakeman's chance of dying from natural causes was less than one in five.").

Workers and their families could bring personal injury lawsuits, but the railroads and their well-paid legal departments also dominated the development of tort law. As one scholar summarized, the "principal thrust of late nineteenth century doctrines was to restrict, rather than to expand, the compensatory function of the law of torts." G. Edward White, *Tort Law in America: An Intellectual History* 61 (1980).

The most effective defenses that the railroads' lawyers persuaded the common-law courts to adopt were the "unholy trinity" of contributory negligence, the fellow-servant doctrine, and assumption of the risk. W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 80, at 569 (5th ed. 1984). *See* Lawrence M. Friedman, *A History of American Law* 412–14 (1973) (tracing the history of these doctrines). As a result, at a time when the number of workers killed and injured on the job was scandalously high and rising, "a large proportion of industrial accidents went uncompensated." *Haman v. Allied Concrete Prod., Inc.*, 495 P.2d 531, 534 (Alaska 1972) (citing Arthur Larson, *Law of Workmen's Compensation* § 4.50, at

21

28–30 (1968)). The broad application of the "unholy triangle" of defenses "approached the position that corporate enterprise would be flatly immune from actions sounding in tort." Friedman, *supra*, at 417.

Lawyers representing injured workers attempted to counter these defenses, but labor's advocates had greater success in statehouses than in courthouses. "Beginning with the Act of the Georgia legislature of 1855 abrogating the fellow-servant defense for railway companies, numerous and other similar Acts cutting down defenses of the employer were enacted in some 25 States prior to enactment of any Workmen's Compensation Acts." *Kamanu v. E.E. Black, Ltd.*, 41 Haw. 442, 451–52 (1956); *see also Haman*, 495 P.2d at 533–34.[4]

While their statutory text varied from state to state, the purpose and effect of these Employers' Liability statutes was to bestow upon employees (in some instances only railroad workers; in others, workers more generally) a right to sue their employers for personal injuries or deaths caused by co-employees. Some statutes also provided a negligence cause of action that limited or eliminated the common-law defenses of contributory negligence and assumption of the risk. *See generally* Wex S. Malone, *American Fatal Accident Statutes-Part I: The Legislative*

---

[4] The House Committee on the Judiciary, in connection with its consideration of the proposed Federal Employers' Liability Act, issued a report reviewing the elements of the various state Employers' Liability statutes and reprinting the text of the relevant laws of forty-one states. *See* Liability of Employers, H. Rep. No. 1386, 60th Cong., 1st Sess. 30–72 (1908).

*Birth Pains*, 4 Duke L.J. 673, 710–18 (1965).

The Supreme Court upheld the constitutionality of such legislation, holding in *Missouri Pac. Ry. Co. v. Mackey*, 127 U.S. 205 (1888), that the Kansas statute—which imposed liability on railroads for injury caused by a fellow employee—did not amount to a "taking" under the Fourteenth Amendment because the company had no property interest in the enforcement of such prospective waivers. *Id*. at 208.

Employers and their legal departments responded with "widespread attempts . . . to contract themselves out of the liabilities the acts were intended to impose." *Duncan v. Thompson*, 315 U.S. 1, 6 (1942). They did so by inserting into their employment contracts provisions whereby the worker "agreed" to waive the right to bring an injury lawsuit based on the negligence of a fellow servant. And the states, in turn, "adopted measures invalidating agreements [that] attempted to exempt employers from liability." *Id.*

Invariably, courts around the country held such prospective waivers of workers' statutory right to sue void and unenforceable. As one commentator noted at the time, both the "modern view" and the "weight of authority" in the United States hold that "Contracts to waive the protection afforded by Employers' Liability Statutes against negligence of fellow-servants . . . are held to be against public policy." *Master and Servant — Duty of Master to Provide Safe Appliances — Contracts Limiting Liability*, 18 Harv. L. Rev. 316, 317 (1905).

A leading decision by the Ohio Supreme Court is typical in its reasoning and temperament:

> [I]t only remains for us to inquire whether railroad companies may ignore or contravene [public] policy by private compact with their employes [sic], stipulating that they shall not be held to a liability for the negligence of their servants which public policy demands should attach to them. The answer is obvious. Such liability . . . has its reason and foundation in a public necessity and policy which should not be asked to yield or surrender to more private interests and agreements.

*Lake Shore & M.S.R. Co. v. Spangler*, 8 N.E. 467, 469–70 (Ohio 1886). Similarly, in *Mumford v. Chicago, R.I. & P.R. Co.*, 104 N.W. 1135, 1137–38 (Iowa 1905), the Supreme Court of Iowa refused on public policy grounds to enforce a waiver of the right to bring an Employers' Liability cause of action for job injuries caused by the negligence of a coworker. To allow prospective waiver of the statute's protections would render the legislature "so seriously crippled that it is well–nigh impotent." *Id.* at 1138. The Iowa court rejected defendant's reliance on "freedom of contract" and on the then-recent decision in *Lochner v. New York*, 198 U.S. 45 (1905):

> [L]iberty under law [is] not absolute license. It is freedom frequently restrained by law for the common good. Surely a corporation, . . . may be compelled to respond in damages for the negligence of its employees, notwithstanding any contract it may make or attempt to make relieving itself from such responsibility or restricting its liability therefor.

*Id.*

Significantly for this case, some states creating a representative cause of action for the wrongful death of worker incorporated the general contract anti-waiver

24

principle into the legislation itself. For example, the California Assembly provided in 1885:

> When death . . . results from an injury to an employee . . . the personal representative of such employee shall have a right of action therefor against such employer, and may recover damages in respect thereof for and on behalf and for the benefit of the [survivors]. . . . Any contract or agreement, express or implied, made by any such employee to waive the benefits of this section, or any part thereof, shall be null and void."

Cal. Civ. Code § 1970 (West). *See also Hancock v. Norfolk & W. Ry. Co.*, 32 S.E. 679, 680 (N.C. 1899), upholding the validity North Carolina's statutory cause of action for the death of a railroad employee due to the negligence of a coworker, including the provision that "any contract or agreement, express or implied, made by any such employee, to waive the benefit of that law shall be void." *Id*. at 680.

When Congress enacted the Federal Employers' Liability Act (FELA) of 1908, ch. 149, 35 Stat. 65 (codified as amended at 45 U.S.C. § 51 *et seq.*), it included both a statutory cause of action for injured railroad workers and an expansive version of the common-law anti-waiver rule: "Any contract, . . . the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void." 45 U.S.C. § 55.

Ultimately, the states placed the right to compensation for job-related deaths and injuries entirely beyond the reach of contractual waivers by the universal adoption of workers' compensation statutes. Martins et al., *supra*, at 1276. The Supreme Court's effective vindication doctrine, which condemns prospective

25

waivers of the right to bring causes of action established by Congress, is a reaffirmation of this historical and well-settled ground for invalidating "any contract." 9 U.S.C. § 2.

## CONCLUSION

Congress enacted ERISA to put an end to the draining of workers' retirement savings due to mismanagement and malfeasance. Michael S. Gordon, *Overview: Why Was ERISA Enacted?*, *in* Special Comm. on Aging, U.S. Senate, 98th Cong., 2d Sess., *The Employee Retirement Income Security Act of 1974: The First Decade* 8 (Comm. Print 1984). Currently ERISA plans "cover 153 million workers, retirees, and dependents who participate in private sector pension and welfare plans that hold an estimated $12.8 trillion in assets." Emp. Benefits Sec. Admin., U.S. Dep't of Labor, *EBSA Restores Over $1.4 Billion to Employee Benefit Plans, Participants, and Beneficiaries* (Oct. 14, 2022), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/ebsa-monetary-results.

The financial future for millions of workers and their families depends on the effectiveness of ERISA's "comprehensive civil enforcement scheme." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 42 (1987). Defendants ask this Court to allow companies and individuals who control their employees' retirement plans to write their own immunity into plan documents. This Court should not allow private contracting parties to undo the safeguards and protections that Congress has put in

26

place for the public good.

For the foregoing reasons, AAJ urges this Court to affirm the judgment below.

Dated: October 4, 2024

Respectfully submitted,

/s/ *Jeffrey R. White*

Jeffrey R. White
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street, NW #200
Washington, DC 20001
(202) 617-5620
jeffrey.white@justice.org

*Counsel for Amicus Curiae*
*American Association for Justice*

27

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because this brief contains 6,492 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman type style.

## CERTIFICATE OF SERVICE

I, hereby certify that on this day, October 4, 2024, a true and correct copy of the foregoing document was filed with the Clerk of Court and electronically served on counsel of record for all parties using the CM/ECF system of the United States Court of Appeals for the Eleventh Circuit. All participants in this case are registered CM/ECF users.

Date:  October 4, 2024                    /s/ *Jeffrey R. White*
                                                    JEFFREY R. WHITE